**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ULTIMATE SPORTS CO., RICHARD A. McGRATH and JANE McGRATH, | CIVIL ACTION – LAW |
| Plaintiff, | |
| v. | NO. 16-0960 |
| U.S. PIPE FABRICATION, LLC and CUSTOM FAB, INC., | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiffs, Ultimate Sports Co. ("Ultimate Sports"), Richard A. McGrath ("Mr. McGrath"), and Jane McGrath ("Mrs. McGrath" (Mrs. McGrath, Mr. McGrath, and Ultimate Sports are referred to collectively as "Plaintiffs"), file this Second Amended Complaint against Defendants, U.S. Pipe Fabrication, LLC ("U.S. Pipe") and Custom Fab, Inc. ("Custom Fab") (Custom Fab and U.S. Pipe are referred to collectively as "Defendants"), and aver as follows:

### The Parties

1.      Plaintiff Ultimate Sports Co. is a company formed in Pennsylvania with a business address of 531 N. 4th Street, Denver, Lancaster County, Pennsylvania, 17517.

2.      Plaintiff Richard A. McGrath is an adult individual residing at 2245 Country Club Drive, Huntingdon Valley, Pennsylvania 19006.

3.      Plaintiff Jane McGrath is an adult individual residing at 2245 Country Club Drive, Huntingdon Valley, Pennsylvania 19006.

4.     U.S. Pipe is a Delaware limited liability corporation with a registered address of 2711 Centerville Road, Suite 400, Wilmington, Delaware  19808, and a corporate office address of Two Chase Corporate Drive, Suite 200, Birmingham, Alabama  35244.

5.     Custom Fab is a Florida corporation with a registered address of 2 South Orange Avenue, 5th Floor, Orlando, Florida  32801, and a principal business address of 109 Fifth Street, Orlando, Florida  32824.

**Jurisdiction And Venue**

6.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

7.     The Court has personal jurisdiction over U.S. Pipe because it regularly conducts business in Pennsylvania and maintains a facility at 596 Trout Run Road, Ephrata, Pennsylvania 17522, which is within the jurisdiction of this Court.

8.     The Court has personal jurisdiction over Custom Fab because it regularly conducted business in Pennsylvania at the time the dispute arose and entered into the Lease, defined below, which is a contract performed in Pennsylvania.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within the jurisdiction of this Court, as described below.

**The Lease**

10.     On or about November 26, 2013, Mr. McGrath and Custom Fab entered into a commercial lease for the use of certain improvements to the real property located at 531 North 4th Street, Denver, Pennsylvania  17517 (the "Original Lease").

41084968

11.    The parties later amended the Original Lease on December 26, 2013 (the "Amendment") (the "Amendment" and the Original Lease are referred to collectively as the "Lease"), to increase the amount of space utilized by Custom Fab (the total amount of space subject to the Lease is referred to collectively as the "Leased Premises").  A true and correct copy of the Lease is attached as Exhibit A and incorporated herein in full.

12.    The term of the Lease is five (5) years, beginning on December 1, 2013, and ending on November 30, 2018 (the "Term").  See Exhibit A, at Pt. I, ¶ 2.

13.    In exchange for the use of the Leased Premises, among other promises, Custom Fab agreed to pay Mr. McGrath base rent in monthly installments in accordance with the terms of the Lease.  See id., at Pt. I, ¶ 3.1; Pt. II, ¶ 4; Amendment, p. 1.

14.    In addition to the base rent, Custom Fab agreed to pay as additional rent certain other amounts, including, without limitation, the following:  water and sewer expenses; certain taxes; special assessments; and insurance premiums (the base rent together with the additional rent are collectively referred to as the "Rent").  See Exhibit A, at Pt. II, ¶¶ 5.1, 5.3, 6; Amendment, at p. 2.

15.    Custom Fab agreed that it would pay certain late charges if it failed to timely pay the Rent as agreed.  See Exhibit A, at Pt. II, ¶¶ 4, 20; Amendment, at p. 1.

16.    Custom Fab further agreed to maintain the Leased Premises in accordance with the terms of the Lease, including, without limitation, returning the Leased Premises "in as good order as when received," and paying for certain utilities and insurance.  See Exhibit A, at Pt. II, ¶¶ 5.3, 5.4, 6; Amendment, at p. 2.

17.    Custom Fab also agreed to the following, in relevant part:

> If [Custom Fab] fails to pay any installment of [Rent] promptly on
> the day when due hereunder or if [Custom Fab] shall fail to

promptly keep and perform any other affirmative covenant or
agreement of this Lease, strictly in accordance with the terms
thereof an shall continue in default for a period of five (5) days
after written notice thereof by [Mr. McGrath] of default and
demand of performance or compliance, then such shall be an Event
of Default …

Upon [an] Event of Default, [Mr. McGrath] may:

18.1 <u>Rent for Term</u>:  Declare the entire rent for the balance of the
Term immediately due and payable.

<u>See</u> Exhibit A, at Pt. II, ¶¶ 17-18.

18.    Custom Fab agreed that if it defaulted under the Lease and Mr. McGrath engages

an attorney, it would reimburse Mr. McGrath for his reasonable attorneys' fees if he is the

prevailing party.  <u>See</u> Exhibit A, Pt. II, ¶ 20.

### <u>U.S. Pipe Acquires Custom Fab, Inc.</u>

19.    Upon information and belief, on or about August 10, 2015, U.S. Pipe acquired all

of the stock of Custom Fab.

20.     On December 15, 2015, Chris Comins ("Mr. Comins"), President of U.S. Pipe,

sent Mr. McGrath a letter regarding the Leased Premises (the "December 15[th] Letter").  A true

and correct copy of the December 15th Letter is attached hereto as Exhibit B and incorporated as

though set forth fully herein.

21.    The December 15th Letter states that U.S. Pipe is the successor-in-interest to

Custom Fab with respect to the Lease.  <u>See</u> Exhibit B.

22.    On April 20, 2016, counsel for U.S. Pipe sent the letter attached as Exhibit C to

the undersigned, acknowledging that U.S. Pipe acquired all of the stock of Custom Fab, but

contending that U.S. Pipe is not the successor-in-interest to Custom Fab and that Custom Fab

remains obligated under the Lease.  <u>See</u> Exhibit C.

23.     U.S. Pipe's assertion concerning its assumption of the Lease notwithstanding, in its Amended Counterclaims with this Court, U.S. Pipe repeatedly asserts that it utilized and enjoyed the benefit of the Leased Premises during the period covered by the Lease.  [Amended Counterclaims, ¶¶ 139, 148.]

24.     Upon information and belief, no sublease exists between U.S. Pipe and Custom Fab.

25.     Among other allegations, U.S. Pipe alleges that Mr. McGrath interfered with both Custom Fab's and "U.S. Pipe's quiet enjoyment of the Leased Premises…," and resulted in both Custom Fab and U.S. Pipe having to relocate.  [Id., ¶ 149, 153-56.]

26.     In fact, U.S. Pipe has asserted claims against Mr. McGrath and/or Ultimate Sports for Breach of Contract, Breach of Implied Covenant of Quiet Enjoyment, Trespass/Constructive Eviction, and Tortious Interference with Contract and Prospective Economic Advantage.  [Id., generally.]

**Defendants' Default Under The Lease By Failing To Pay Rent As Agreed**

27.     Defendants failed to pay Rent as agreed from December, 2014, through the present.

28.     Defendants' rental payments since December, 2014, have failed to include the 1.7% Consumer Price Index adjustment, amounting to $275.28 per month.  See Exhibit A, at Pt. I, ¶ 3.1.

29.     The past due rent, fees, and late charges owed by Defendants for the Leased Premises total $146,040.38.

30.     Defendants' failure to timely pay Rent is an Event of Default as that term is defined in the Lease.  See Exhibit A, at Pt. II, ¶¶ 17, 18.1.

41084968

**Defendants Anticipatory Breach Of The Lease**

31.     In the December 15th Letter, Mr. Comins, on behalf of U.S. Pipe, as "successor-in-interest to Custom Fab," stated that U.S. Pipe "will vacate the Leased Premises on or about March 1, 2016."  See Exhibit B.

32.     Mr. Comins further stated that U.S. Pipe would continue to pay Mr. McGrath's assignee, Metro Bank, the "appropriate rent through the date of Custom Fab's vacation of the Leased Premises," only.  See Exhibit B.

33.     On January 14, 2016, by way of letter to counsel for U.S. Pipe and based on the anticipatory breach set forth in the December 15th Letter, among the other defaults under the Lease by Custom Fab set forth herein, counsel for Mr. McGrath demanded payment under the Lease (the "January 14th Letter").  A true and correct copy of the January 14th Letter is attached hereto as Exhibit D and is incorporated as though set forth fully herein.

34.     On February 11, 2016, Mr. Comins, on behalf of U.S. Pipe, sent Mr. McGrath another letter regarding the Leased Premises (the "February 11th Letter").  A true and correct copy of the February 11th Letter is attached hereto as Exhibit E and incorporated as though set forth fully herein.

35.     In the February 11th Letter, Mr. Comins notified Mr. McGrath that U.S. Pipe will continue to occupy and use the Leased Premises until April 1, 2016, at which point U.S. Pipe will vacate the Leased Premises and cease paying rent under the Lease.  See Exhibit E, at p. 1.

41084968

**Defendants Damaged The Leased Premises**

36.     Defendants and/or their agents have damaged Mr. McGrath's driveway at the Leased Premises.

37.     Specifically, Defendants and/or their agents drove overweight trucks throughout the Leased Premises and Mr. McGrath's property without Mr. McGrath's consent.

38.     Defendants and/or their agents caused substantial ruts and potholes throughout the Leased Premises and Mr. McGrath's property that will cost in excess of $50,000.00 to repair.

39.     Defendants have failed to repair the damage they caused to the Leased Premises and Mr. McGrath's property.

40.     On or about April 4, 2016, Defendants vacated the Leased Premises.

41.     After Defendants vacated the Leased Premises, Mr. McGrath discovered that Defendants and/or their agents caused substantial damage to the interior and exterior of the Leased Premises, some of which is depicted in the photographs attached as Exhibit F.

42.     The damage referenced in Paragraph No. 39 includes, but is not limited to, significant paint and oil stains on the floors and walls of the Leased Premises that will cost Mr. McGrath in excess of $80,000.00 to repair.

43.     Further, Defendants failed to remove debris and equipment from the Leased Premises, which will cause Mr. McGrath to incur substantial costs to remove.

**Interference With Metro Bank Contracts**

44.     Metro Bank entered into a lending relationship with Mr. and Mrs. McGrath and Ultimate Sports, extending loans to them totaling in excess of $1.5 million (collectively referred to as the "Loans").

41084968

45.    Custom Fab knew about the Loans and the relationship between Plaintiffs and Metro Bank.

46.    On March 16, 2015, Custom Fab, through its agent, Salzmann Hughes, P.C., sought information from Metro Bank regarding Loans, including, without limitation, their payments status.  A true and correct copy of the March 16, 2015 inquiry is attached as Exhibit G.

47.    On March 20, 2015, through a letter from its agent, Salzmann Hughes, P.C., to Metro Bank, Custom Fab claimed that Plaintiffs could not repay the loans (the "March 20, 2015 Letter").  A true and correct copy of the March 20, 2015 Letter is attached as Exhibit H.

48.    The March 20, 2015 Letter also misrepresented the value of the Leased Premises and the outcome of then-existing litigation between Custom Fab and Mr. McGrath in an effort to mislead Metro Bank regarding Mr. McGrath's and/or Plaintiffs' creditworthiness. Id.

49.    After receiving the above-referenced correspondence from Custom Fab, Metro Bank called a default on the Loans and confessed judgment against Plaintiffs.

50.    After prompting Metro Bank to call a default on Plaintiffs Loans, Custom Fab, through its agent, Salzmann Hughes, P.C., advised Metro Bank to take legal action against Plaintiffs.  See email dated July 15, 2015, a true and correct copy of which is attached hereto as Exhibit I.

51.    Finally, Defendants (this action took place after U.S. Pipe acquired Custom Fab) "ghost wrote" a letter for Metro Bank to send to Mr. McGrath wherein Defendants asked Metro Bank to collude with them to facilitate Defendants' breach of the Lease.  A true and correct copy of the November 3, 2015 email from Defendants' agent, Salzmann Hughes, P.C., to Metro Bank is attached as Exhibit J.

41084968

## COUNT I
## BREACH OF CONTRACT
### (Mr. McGrath v. Defendants)

52.     The foregoing paragraphs are incorporated herein by reference as though fully set forth at length.

53.     As set forth above, Custom Fab entered into the Lease, which is a valid and binding contract.

54.     Custom Fab, by sharing the Leased Premises with U.S. Pipe without a sublease, has failed to observe the corporate formalities between itself and U.S. Pipe, such that the veil should be pierced by and between them.

55.     The December 15th and February 11th Letters represent an unequivocal anticipatory and material breach of the Lease.

56.     As set forth above, Custom Fab materially breached the Lease by (1) repudiating the Lease, (2) failing to pay Rent as agreed, and (3) damaging the Leased Premises and/or failing to maintain the Leased Premises as agreed (the "Defaults").

57.     Defendants caused substantial damage to the interior and exterior of the Leased Premises, some of which is depicted in the photographs attached as Exhibit F.

58.     The damage referenced above includes, but is not limited to, significant paint and oil stains on the floors and walls of the Leased Premises that will cost Mr. McGrath in excess of $80,000.00 to repair.

59.     Defendants and/or their agents have caused substantial ruts and potholes throughout the Leased Premises and Mr. McGrath's property that will cost in excess of $50,000.00 to repair.

41084968

60.     Additionally, Defendants failed to remove debris and equipment from the Leased Premises, which will cause Mr. McGrath to incur substantial costs to remove.

61.     Mr. McGrath has demanded payment pursuant to the Lease.  See Exhibit C.

62.     Defendants have continued the Defaults and are bound by the terms of the Lease through the end of the Term.

63.     As a result of the Defaults, Mr. McGrath may declare the entire Rent, including, without limitation, all back Rent and Rent through the balance of the Term of the Lease immediately due and payable.  See Exhibit A, at Pt. II, ¶ 18.1.

64.     As a result of the Defaults, Mr. McGrath has been damaged in and amount in excess of $800,000.00, plus interest, costs, attorneys' fees and all other damages allowed by law.

65.     U.S. Pipe is liable for Custom Fab's breach due to their failure to observe corporate formalities with respect to the Lease/Leased Premises.

WHEREFORE, Mr. McGrath requests that judgment be entered in his favor and against Defendants in an amount in excess of $800,000 plus interest, costs of suit and such further relief as this Court may deem appropriate.

## COUNT II
## UNJUST ENRICHMENT
**(Mr. McGrath v. U.S. Pipe - In the alternative to Breach of Contract as to U.S. Pipe)**

66.     The foregoing paragraphs are incorporated herein by reference as though fully set forth at length.

67.     U.S. Pipe received the benefit of the use and possession of the Leased Premises without making payment for such use and possession.

68.     It would be inequitable for U.S. Pipe to have enjoyed the benefits conferred upon it without payment to Mr. McGrath.

10

41084968

WHEREFORE, Mr. McGrath requests that judgment be entered in his favor and against U.S. Pipe in an amount in excess of $100,000 plus interest, costs of suit and such further relief as this Court may deem appropriate.

### COUNT III
### TRESPASS/WASTE
**(Mr. McGrath v. U.S. Pipe - In the alternative to Breach of Contract as to U.S. Pipe)**

69.    The foregoing paragraphs are incorporated herein by reference as though fully set forth at length.

70.    U.S. Pipe committed waste to the Premises upon vacating as set forth above.

71.    U.S. Pipe's waste has caused Mr. McGrath significant damages.

72.    U.S. Pipe's actions were intentional, knowing, willful, wanton, unlawful, and malicious, and  were undertaken with the specific intent to economically harm Mr. McGrath, thereby entitling Mr. McGrath to an award of punitive damages

**WHEREFORE**, Plaintiff requests judgment in his favor and against Defendants in an amount in excess of $100,000, plus attorneys' fees, costs, punitive damages, interest, and such other and further relief as the Court may deem just and equitable.

### COUNT IV
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
**(Plaintiffs v. Defendants)**

73.    The foregoing paragraphs are incorporated herein by reference as though fully set forth at length.

74.    Defendants knew that Plaintiffs had an existing contractual lending relationship with Metro Bank.

75.    Defendants nevertheless intentionally and knowingly attempted to induce Metro Bank to take legal action against Plaintiffs by misstating the status of the Lease and Mr.

11

McGrath's and/or Plaintiffs' ability to repay Metro Bank, leading Metro Bank employees to believe that they had no other option other than to accelerate the balances of the Loans.  See Exhibits H and I.

76.     Defendants also advised Metro Bank to take legal action against Mr. McGrath by misrepresenting the status of the Lease and Mr. McGrath's creditworthiness.  Id.

77.     Defendants have thereby intentionally and tortiously interfered with Plaintiffs' contractual relationships with Metro Bank.

78.     Defendants have no legal privilege or justification for the foregoing unlawful conduct.

79.     As a direct and proximate result of Defendants' foregoing unlawful conduct, Plaintiffs have sustained significant damages in an amount to be proven at trial.

80.     This tortious interference was willful, wanton, malicious, extreme and outrageous and undertaken with the specific intent to economically harm Plaintiffs, thereby warranting the imposition of punitive damages.

81.     Upon information and belief, U.S. Pipe and Custom Fab have failed to observe corporate formalities, rendering U.S. Pipe liable for Custom Fab's damages.

41084968

WHEREFORE, Plaintiff requests that judgment be entered in their favor and against Defendants in an amount in excess of $150,000 plus punitive damages, interest, costs of suit and such further relief as this Court may deem appropriate.

**FOX ROTHSCHILD LLP**

Date:   July 8, 2016               BY:     /s/Ashley L. Beach
                                                   Michael G. Menkowitz, Esquire
                                                   Samuel W. Cortes, Esquire
                                                   Ashley L. Beach, Esquire
                                                   Attorney ID Nos. 61478, 91494, 306942
                                                   747 Constitution Drive, Suite 100
                                                   Exton, PA  19341-0673

                                                   *Attorneys for Plaintiffs*

41084968

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ULTIMATE SPORTS CO., RICHARD A. McGRATH and JANE McGRATH, | CIVIL ACTION – LAW |
| Plaintiff, | |
| v. | NO. 16-0960 |
| U.S. PIPE FABRICATION, LLC, as successor-in-interest to CUSTOM FAB, INC.; and CUSTOM FAB, INC., | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I, Ashley L. Beach, Esquire, certify that on July 8, 2016, I served a true and correct copy of the foregoing Second Amended Complaint upon counsel of record via the Court's electronic filing notification system, addressed as follows:

> Samuel E. Wiser, Jr., Esquire
> Scott T. Wyland, Esquire
> SALZMANN HUGHES, P.C.
> 112 Market Street, 8th Floor
> Harrisburg, PA 17101
> swiser@salzmannhughes.com
> swyland@salzmannhughes.com
> *Counsel for Defendants*

> /s/Ashley L. Beach
> Ashley L. Beach, Esquire

14

41084968

# EXHIBIT A

11193256v1

LEASE AGREEMENT

Dated

Between

Custom Fab

and

Richard McGrath

For the Premises at:

531 North Fourth St.

Denver, PA17517

L E A S E

Part I

MADE and executed this __26th__ day of November, 2013

By and Between Richard McGrath, herein called "Landlord"; and Custom Fab, a Florida

corporation having its principal place of business at 109 Fifth St. Orlando, FL 32824, hereinafter

called "Tenant". Landlord does hereby lease unto Tenant the "Premises" at the "Rent" for the

"Term" for the "Permitted Use" upon and under the Terms and Conditions set forth in this Part I

and Part II (collectively the "Lease") all as follows:

1. Premises:

    1.1.    Location: 531 North Fourth St. in the Borough of Denver, County of Lancaster,

         Pennsylvania, 17517.

    1.2.    Improvements:

        1.2.1.  ( ) Premises leased with existing improvements.

        1.2.2.  (X) Improvements by Landlord to be completed for occupancy. Exhibit C

        1.2.3.  (X) Optional improvements that may be completed by Tenant. Exhibit D

        1.2.4.  Description of the Premises: A portion of the Property including an undivided

            interest in all common areas, described as:

            1.2.4.1.  21,330 SF of warehouse space

            1.2.4.2.  Outside Storage as specified in Exhibits A & B consisting of

                40,000SF.

            1.2.4.3.  Rentable SF: 21,330 SF

            1.2.4.4.  Tenant's Proportionate Share shall be the sum of the i)

weighted fraction of the building and the ii) weighted fraction of the exterior. The

i) weighted fraction of the building shall be 70% multiplied by a fraction, the

numerator of which shall be the Rentable Square Feet and the denominator of which

shall be 74,000. The ii) weighted fraction of the exterior shall be 30% multiplied

by a fraction the numerator of which shall be the Outside Storage and the

denominator of which shall be 119,308. The Tenant's Proportional Share is

therefore determined to be 30.2%.

2. Term:

    2.1. Number of Years:            Five (5)

    2.2. Term Begins:               December 1, 2013

    2.3. Term Ends:                 November 30, 2018

    2.4. Base Rent Commencement Date:   January 1, 2014

    2.5. Utility Commencement Date:      December 1, 2013

    2.6. Occupancy Date:           December 1, 2013

    2.7.    Expiration Date:          November 30, 2018 subject to Options to Renew or Termination as described herein

3. Rent:

    3.1. Rent: See Base Term Schedule Below:

BASE TERM

| Time Period | Annual Amount | Monthly Amount |
|---|---|---|
| Year 1 | $ 90,000.00 | $ 7,500.00 |

Annual Base Rent increases thereafter shall be in an amount equal to the "CPI Factor", with a cap not to exceed a 5% (five percent) increase for any given year. The "CPI Factor" is the percentage equal to a fraction, the numerator of which is the Index (as defined below) most recently published prior to the Adjustment Date (the "Numerator Index") and the denominator of which is the Index published twelve (12) months prior to the date on which the Numerator Index was published. The term Index shall mean the Consumer Price Index for all Urban Consumers (CPI-U) for the U.S. City Average for all items (1982-84=100), published by the Bureau of Labor Statistics of the United States Department of Labor. The Adjustment Date shall be November 30th of each year during the term of the lease.

    3.2. Options to Renew:

        Tenant shall have the right to renew this lease for thee (3) additional five (5) year terms by giving Landlord one hundred and twenty (120) days written notice prior to the expiration of the then current Term, upon the terms described below .

        Upon Tenant providing Landlord with written notice of Tenant's option to renew, the rent shall continue to increase annually according to paragraph 3.1during any option period

exercised.

4.    Security Deposit:    $7,500.00, which will be held in a separate interest bearing account, with the interest accruing for the benefit of the Tenant.

5.    Permitted Use:    Fabrication and Warehouse for Custom Fab

6.    Landlord approves of the tenant improvements contained in Exhibit D, subject to permitting and approval from Denver Borough. Tenant shall bear the cost of the Exhibit D improvements and Tenant may select qualified contractors and vendors to complete the Exhibit D improvements with prior approval of Landlord.  In the event that Exhibit D is not prepared in time for the signing of this Lease, then Landlord reserves the right to approve in writing the Tenant improvements and such approval shall not be unreasonably withheld.


IN WITNESS WHEREOF intending to be legally bound, the Landlord and Tenant have caused this Part I presents to be signed by their duly authorized officers or agents and their appropriate seals to be hereunto affixed, the day and year first above written.

"Landlord"

By  Richard McGrath

Landlord
Title


"Tenant"

By   Christopher M. Comins

President/CEO
Title

PART II

OF

LEASE DATED

between

<u>Richard McGrath</u>, "Landlord" and
<u>Custom Fab</u>, "Tenant"

1.  PREMISES.  The Landlord does hereby lease unto the Tenant and the Tenant does hereby lease from the Landlord the Premises with improvements erected or to be erected thereon, which leased area is highlighted on the site plan attached hereto and made a part hereof as Exhibit "A," on the terms and conditions set forth in Parts I and II.

2.  IMPROVEMENTS.  Said Premises shall be leased on an "as is" basis other than the work specified in Exhibit C.

3.  TERM.     Tenant is to have and to hold the Premises for the Term set forth in Section 2.1 of Part I and beginning and ending as set forth in Sections 2.2 and 2.3 of Part I. If the Premises or a portion thereof are ready for occupancy prior to the Commencement Date of the Lease and if Tenant accepts occupancy, Tenant may have such occupancy, without change to the Term, by paying a pro-rata portion of the Rent based on a thirty (30) day month.

4.  RENT.     The parties agree that the Fixed Rent for the Premises shall be as set forth in Section 3.1 of Part I, and unless accelerated in the event of Tenant's default, Tenant shall pay such rent in the equal monthly installments, in advance, on the first day of each month during the Term, to the Landlord or its duly designated agent.  Tenant shall pay to Landlord upon the signing of the Lease the Security Deposit set forth in Section 3.4 of Part I which shall be held by Landlord in a separate interesting bearing account, with the interest accruing for the benefit of the Tenant, as security for the performance by Tenant of its obligations under this Lease and if Tenant is not in default at the termination of this Lease, then the Security Deposit, with any accrued interest shall be returned to Tenant. In the event that said rental amount is not received by the fifth day of the month for which it is due, Tenant shall pay a late fee of $100.00 plus $25.00 per day thereafter until the monthly rental amount is paid in full.

5.    OBLIGATIONS TO BE PERFORMED BY TENANT.

5.1    Utilities:  The Tenant will pay all utilities billed separately by the utility company to Tenant,  including, heat, telephone and any other utility or service used or consumed on the Premises, including trash removal.

(a)    Water/Sewer - In addition to Base Rent, Tenant shall pay $159.00/month reimbursement for water/sewer usage.

5.2    Electric Expense:  Whereas the Tenant and Landlord agree that Tenant is responsible to pay for the electric power consumed by Tenant, and whereas the leased property is not separately metered, Tenant and Landlord agree to the following method to measure and pay for electrical power:  Tenant shall pay, at the end of every electrical billing period, an amount equal to the i) current billable rate for electrical Generation and Transmission charges multiplied by the difference of the current KH consumed in the period less the KH consumed during the equivalent period from the Baseline Year,  ii) current billable rate for electrical Distribution charges multiplied by the difference of the current kW measured in the period less the kW measured during the equivalent period from the Baseline Year,  iii)  applicable prorated Generation, Transmission and Distribution taxes levied on items i) and ii).  The Baseline Year shall be the 12 months immediately preceding the commencement date of the lease as evidenced by Exhibit E.  In the event Tenant believes there is an increase in its consumption of electric power unrelated to the use of its Premises, Tenant shall have the right to have the method of calculating its Electric Expense revisited with the Landlord; but in any event, Tenant shall have the right to have its Premises placed on a separate power meter from the rest of the Property, and shall thereafter pay its own Electrical Expenses.

5.3    Taxes and Special Assessments:  The Tenant will pay to Landlord, as additional rent, Tenant's Proportionate Share of all real estate taxes, charges, assessments and payments levied or assessed on the Property during the term of the Lease by any public or governmental body against the Premises or which may be assessed or levied by virtue of any business or activity conducted on the Premises including any imposition imposed on Landlord in lieu of or in substitution for real estate taxes, charges, assessments or payments. The Tenant's responsibility for payment of taxes and special assessments imposed during the term of this Lease shall be prorated for those installments which fall

due during the term of this Lease.

5.4     Repairs: (a)    Landlord shall maintain and repair the outside walls, roof, exterior doors, structure and common areas of the Building, and all parking areas, and the pipelines and all other equipment and fixtures employed in delivering water, electricity and other utilities to the Building.  In addition, Landlord shall replace any existing HVAC unit serving the Premises (or any major component thereof) which Landlord determines requires replacement due to failure resulting from normal usage or the age thereof.  Except as provided in this paragraph or in the event of casualty, Landlord shall have no obligation to repair, maintain, alter, or modify the Premises or any part thereof.

        (b)    Tenant shall keep the interior of the Premises, including all drywall, acoustical ceilings, lighting, doors, hardware, windows, plumbing and electrical fixtures and delivery systems, plate glass, and door and window glass, in good order, making all repairs, alterations, replacements, and modifications, at its own expense, and shall surrender the Premises at the expiration or earlier termination of this Lease in as good order as when received, excepting only ordinary wear and tear and damage by fire or other casualty of the kind insured against in standard policies of fire insurance with extended coverage.

        (c)    Except as provided for in Paragraph 5.4 (a) above, Tenant, at its own expense, shall maintain and repair the heating, ventilating and air conditioning systems which provide service to the premises.  Throughout the term of the Lease, Tenant shall maintain a HVAC service contract with a qualified HVAC service company, such contract to include at least semi-annual inspection and routine maintenance (including filter changes, lubrication and providing of refrigerant as required).  Tenant shall supply Landlord with a copy of Tenant's service contract within 30 days of occupancy.

        (d)    Tenant shall give notice to Landlord of any defect in, or need for repair of, the Premises and utility systems serving the Premises.  Landlord shall not be obligated to perform any maintenance or repair unless notice of the need thereof has been given by Tenant to Landlord, and Landlord shall not be liable to Tenant or any person claiming through or under Tenant, for any bodily injury or damage to property resulting from the failure to make any repair, unless the damage or bodily injury results from negligent failure or refusal of Landlord to make a bona fide effort to make repairs within a reasonable time

following notice by Tenant of the need for such repairs.

5.5    Clean Condition:  The Tenant shall keep the interior and exterior of the Premises in a clean, sanitary and safe condition to the satisfaction of the Landlord and in accordance with the laws, ordinances and regulations of the Federal Government, Commonwealth of Pennsylvania and of the Township in which the Premises is located. Tenant shall comply with all requirements of law, ordinances and regulations, including those relating to Labor and Industry, zoning, occupational safety and health and Tenant shall pay any cost associated with its breach of such laws and regulations.

5.6    Snow Removal and Lawn Maintenance:  Landlord shall mow lawns, trim shrubbery, weed where appropriate and remove snow from walkways, driveways, and parking areas designated as Area A and Area B in Exhibit B.

5.7    Liability Insurance:  Tenant further covenants that it will at all times during the Term at its own expense, maintain and keep in force for the mutual benefit of Landlord and Tenant, commercial general  liability insurance against claims for personal injury, death, or property damage occurring in, on or about the Premises to afford protection to the limit of not less than One Million ($1,000,000.00) Dollars combined for both bodily injury and physical damage as a result of any one occurrence, One Million ($1,000,000.00) personal and advertising injury and Two Million ($2,000,000.00) general aggregate.  Such insurance shall be written under ISO form CG0001 or equivalent and shall name Landlord as an additional insured and require thirty (30) days notice to Landlord before cancellation.

5.8    Compliance with Legal Requirements:  Tenant at all times shall comply strictly with all requirements of all duly constituted public authorities having jurisdiction as well as with the terms of all state, federal or municipal statutes, ordinances or regulations which are or may at any time hereafter become applicable to the Premises, to the activities conducted thereon, and to Tenant as lessee thereof.  Tenant shall save Landlord harmless from all penalties, fines, costs and damages of every kind which may result from any failure to do so.  At all times during the term of this Lease, Tenant shall maintain and comply with all permits, licenses and other authorizations required by any governmental authority or agency for Tenant's occupancy or operations at the Premises.

6.  FIRE INSURANCE.        Landlord shall procure and maintain in full force and effect non-

assessable fire insurance policies, which insurance shall include protection against loss to the building for those occurrences covered by standard "extended coverage" clause. Such policies shall name Landlord as the sole insured and shall not provide coverage for Tenant's personal property, improvements and betterments. In the event of loss, insurance proceeds shall be held in escrow by Landlord's mortgagee, if any, and otherwise by an escrow agent selected by Landlord pending repair of damages by Landlord, and upon completion the proceeds shall be paid to Landlord or paid to Landlord's mortgagee if required by it. In the event Landlord or Tenant elects to terminate the Lease as hereinafter provided, insurance proceeds shall be paid immediately to Landlord or its mortgagee if required by it. Tenant shall pay to Landlord, as additional rent, the Tenant's Proportionate Share of the premium for such insurance, and if such policy shall be a blanket policy, then Tenant shall pay such increase in premium attributable to the coverage of the Premises by the policy.

7.  WAIVER OF SUBROGATION.    Each party waives rights of subrogation against the other with respect to any insured risks.

8.  USE OF BUILDING. The parties hereto agree that the Premises may be used for the permitted use set forth in Section 4 of Part I and uses incidental thereto. Tenant shall not permit the Premises to be vacant.

9.  ALTERATIONS.    No alterations shall be made in or to the Premises, other than the Tenant Work specified in Exhibit D, without the prior written consent of the Landlord and shall be subject to Landlord's inspection and approval, which shall not be unreasonably withheld. All machines, equipment, and supplies to be placed upon the Premises by the Tenant shall remain the property of the Tenant and shall be removed at the termination of the Lease; but the Tenant agrees to repair any damage to the Premises caused by the removal of such machines, equipment, or supplies.

10.  SIGNS AND EXTERIOR ATTACHMENTS.    No signs, lights, or other attachments or fixtures shall be placed on the exterior of the improvements or otherwise placed on the Premises unless Tenant shall obtain the prior written approval of Landlord, which shall not be unreasonably withheld. Tenant shall be responsible for obtaining a permit for said sign(s) from the appropriate municipal authority prior to installation and the cost of creating and installing said sign.

11.    FIRE AND OTHER DAMAGE.        In case of damage to the Premises by a risk insured against under Paragraph 6 of this Part II, Landlord, unless it shall otherwise elect as hereinafter provided, shall repair or cause to be repaired such damages with reasonable dispatch after receiving from the Tenant written notice of the damage.  If the damages are such as to render the Premises untenantable, the rent shall be abated to an extent corresponding with the period during which and the extent to which the Premises have become untenantable; provided, however, if such damages are caused by the negligence of Tenant or of a Subtenant, or the agents, employees, visitors, invitees or licensees of Tenant or of a Subtenant, then notwithstanding such damages and untenantability, Tenant shall be liable for rent without abatement.  In the event of damage to the Premises to the extent of more than fifty (50%) percent of the value of such Premises, Tenant shall give Landlord written notice of the damage, (but failure to give notice shall not be binding upon Landlord) after which either party may determine with reasonable dispatch, that the Lease shall be terminated, in which event rent and other obligations shall abate and the Lease terminate as of the date of the occurrences of the event causing such damage.

12.    CONDEMNATION. The Tenant may at its option terminate this Lease if any portion of the Premises is condemned by any governmental body or by any other body or organization possessing the power of condemnation provided such condemnation substantially impairs the use or enjoyment by Tenant of the Premises.  In case of the taking through eminent domain of all, or any portion, of the Premises, the Landlord shall notify the Tenant in writing of such taking.  Within sixty (60) days after receipt of such written notice, the Tenant shall notify the Landlord, in writing, whether such taking through eminent domain in the opinion of the Tenant substantially impairs its use or enjoyment of the premises.  If the Tenant's decision on this matter is in the affirmative, then it shall also include in said notice the time when it desires to terminate the Lease, which time shall not be earlier than the date scheduled for the commencement of physical work (other than surveying and staking out) to be instituted on the Premises by the condemning authority, nor later than sixty (60) days after the same time.  The giving of such notice by the Tenant does not bind the Landlord as to the correctness of the Tenant's decision that its use or enjoyment of the Premises is substantially impaired by the taking.

13.    NON-LIABILITY.    (a)  The Landlord shall not be liable to the Tenant, any officer,

employee, agent, invitee, licensee or visitor of the Tenant, or any other person, for damage or injury to any person or property caused by any act, omission or neglect of the Tenant, its employees or agents, invitee, licensee, or visitor and Tenant shall indemnify, defend and hold harmless Landlord from any claim, loss or liability therefor.

(b) The Tenant shall not be liable to the Landlord, any officer, employee, agent, invitee, licensee or visitor of the Landlord, or any other person, for damage or injury to any person or property caused by any act, omission or neglect of the Landlord, its employees or agents, invitee, licensee, or visitor and Landlord shall indemnify, defend and hold harmless Tenant from any claim, loss or liability therefor.

(c) All property kept, stored or maintained on the Premises shall be so kept, stored or maintained at the risk of the Tenant only, and the Landlord shall not be liable for any loss or damage to the Tenant or his property, except when caused by the act, omission or negligence of the Landlord.

14.    SUBLEASE.        The Tenant shall not assign, sublet, pledge, grant a security interest in, or encumber this Lease or permit the use of the whole or any part of the Premises by any licensee or concessionaire without first obtaining the written consent of Landlord, which may be withheld by Landlord in its sole discretion.  This prohibition shall be construed to include a prohibition against any assignment or subletting by operation of law. If Tenant shall attempt to assign this Lease or sublet or otherwise permit occupancy of the Premises by another without first securing a release from Landlord, Landlord may collect Rent from the purported assignee, sub-lessee or occupant, and apply the net amount collected to the Rent due hereunder, and such action on the part of Landlord shall not, under any circumstances, be deemed a waiver of the breach of this provision by Tenant or the acceptance of the assignee, subtenant or occupant, or as a release of Tenant from any of its obligations contained in this Lease.

15.    VOLUNTARY OR INVOLUNTARY ASSIGNMENT.    Neither this Lease nor any interest therein shall be assignable or otherwise transferable by operation of law or by voluntary assignment or for the benefit of creditors without the written consent of the Landlord, and such prohibition against voluntary assignment includes and comprehends any and every assignment which might otherwise be effected or accomplished by bankruptcy, receivership, attachment, execution or other judicial process or proceeding.  If any

assignment for the benefit of its creditors should be made by the Tenant, or if a voluntary or involuntary petition in bankruptcy, or for reorganization, or for a similar arrangement should be filed by or against the Tenant, or if the Tenant should be adjudicated a bankrupt or insolvent, or if a receiver is appointed of or for the Tenant, or for all or a substantial part of its property, or if any such assignment or transfer by operation of law should occur, then and in any such event, the Landlord may at its option, terminate this Lease by notice to the Tenant. The provisions of this paragraph shall not apply to any of the rights, titles and interest of the Landlord in, to or under this lease.

16.  SURRENDER AT LEASE TERMINATION.    The Tenant shall, upon the termination of the Term of this Lease, surrender to the Landlord the Premises and all fixtures situated thereon except items which may be removed under Section 9 of Part II. All alterations, improvements, and other additions which may be made or installed by either party to, in, upon, or about the Premises shall either be removed by Tenant under Section 9 of Part II or become the property of the Landlord as the Landlord may elect and if Landlord elects to keep the same they shall be surrendered to the Landlord by the Tenant without compensation, in their existing condition, and otherwise Tenant shall repair any damage caused by removal.

17.  EVENTS OF DEFAULT.        If Tenant fails to pay any installment of rent promptly on the day when due hereunder or if Tenant shall fail to promptly keep and perform any other affirmative covenant or agreement of this Lease, strictly in accordance with the terms thereof and shall continue in default for a period of five (5) days after written notice thereof by Landlord of default and demand of performance or compliance, then such shall be an Event of Default. If any default shall occur, other than in the payment of money, which cannot with due diligence be cured within such period of five (5) days from and after the giving of notice as aforesaid, and Tenant commences to cure such default and proceeds diligently and with reasonable dispatch to take all steps and do all work required to continue to cure such default and does so cure such default, then Landlord shall not have the right to declare an Event of Default. Any of the following shall also constitute an Event of Default: Tenant is adjudicated a bankrupt, institutes proceedings for a reorganization or for an arrangement under the Bankruptcy Act, or an involuntary petition in bankruptcy is filed against Tenant, which is not dismissed within ninety (90) days.

18.    LANDLORD RIGHTS.          Upon Event of Default, Landlord may:

18.1 Rent for Term:  Declare the entire rent for the balance of the Term immediately due and payable.

18.2 Entry:   Enter into the Premises or any part thereof, with or without notice of process or law, and expel Tenant or any person occupying the same using such force as may be necessary and relet the Premises for the Tenant's account.

18.3 Confession of Judgment: Landlord may confess against Tenant, Tenant hereby authorizing an attorney of any court of record to appear for and confess judgment against Tenant for the amount of rent and other sums due and unpaid, including rent accelerated by landlord with attorney's commission of ten (10%) percent and costs of suit, without stay of execution, waiving appraisement, inquisition and exemption.

18.4 Confession of Ejectment: Confess judgment in ejectment against Tenant, Tenant hereby authorizing any attorney of any court of record of Pennsylvania to appear for Tenant and confess judgment in ejectment for the Premises and Tenant authorizing the immediate issuance of a writ of possession for the Premises.

19.    HOLDING OVER.   In the event Tenant continues to occupy the Premises after the last day of the Term and Landlord elects to accept monthly Rent therefor, a tenancy from month to month only shall be created and not for any longer period with the monthly rental payment to be twice the amount being paid by Tenant to Landlord at the expiration of the most recent Lease term.

20.    INTEREST AND COLLECTION EXPENSE.          Interest shall accrue on any monies due from Tenant to Landlord from five (5) days after the same are due (including rent and money advanced by Landlord to others on account of the failure of tenant to perform hereunder) at the rate of one and one-quarter (1-1/4%) per month until the same is paid and Tenant shall pay the interest upon demand.  If either party engages an attorney due to the other party's default hereunder, the defaulting party shall reimburse the prevailing party for reasonable attorney fees (whether or not litigation is commenced) and court costs incurred.

21.    SUBORDINATION. Tenant shall subordinate its interest in the Premises to the lien, operation and effect of mortgages as requested by Landlord from time to time, provided that such subordination shall permit Tenant to occupy the Premises under the terms of the

Lease so long as Tenant is not in default.

22. **ADDITIONAL INSTRUMENTS.** Tenant shall, at the request of Landlord, execute such additional instruments Landlord's mortgagee may request from time to time or as may be required or convenient and not inconsistent herewith.

23. **LANDLORD'S COVENANT OF TITLE AND QUIET ENJOYMENT.** Landlord covenants and warrants that upon the Lease commencing, it shall have full right and lawful authority to enter into this Lease for the full Term hereof, and that Landlord will be lawfully seized of the entire Premises and will have good title thereto and that at all times when Tenant is not in default under this Lease and during the Term of this Lease, Tenant's quiet and peaceable enjoyment of the Premises shall not be disturbed or interfered with by anyone. Landlord in person or by agent shall be permitted to enter upon the Premises at reasonable times to examine the same or to make such repairs as are required hereunder.

24. **SUCCESSORS AND ASSIGNS.** The Lease shall inure to the benefit of and shall bind the successors and assigns of the parties to the extent that the parties' rights hereunder may succeed and be assigned according to the terms hereof.

25. **DESCRIPTIVE HEADINGS.** The descriptive headings of the several paragraphs hereof are inserted for convenience only and shall not control or affect the meaning or construction of any of its provisions.

26. **SERVICE OF NOTICE.** If at any time after the execution of this Lease it shall become necessary or convenient for one of the parties hereto to serve any notice, demand or communication upon the other party, such notice, demand or communication shall be in writing signed by the parties serving the same, sent by United States mail, to the respective addresses set forth in the preamble of Part I, or at such other address as either party may have furnished to the other in writing as a place for the service of notice. Any notice so mailed shall be deemed to have been given as of the time it is deposited in the United States mail.

27. **COMMISSIONS.** In consideration of the efforts and services of NAI Commercial Partners, Inc. (NAI/CPI) and John Thiry, CCIM in procuring said Tenant, Landlord agrees to pay said broker a commission equal to six (6%) percent of the base rental amount on the entire term of the lease including any renewals, extensions or expansions thereof. The commission shall be payable as follows: annual payments over the entire term of the lease,

payable upon occupancy and each anniversary date thereafter, including renewals, extensions and expansions thereof.

28. STIPULATION AGAINST LIENS; MECHANICS LIENS.    Prior to commencing any substantial improvement in the Premises, Tenant shall cause an appropriate stipulation against liens to be filed with the Lancaster County Prothonotary, which stipulation against liens shall be signed by the general contractor for the work in question, or if there is no general contractor, then such stipulation against liens shall be signed by each contractor doing work on the Premises. The stipulation(s) shall be filed prior to any delivery of materials to the Premises or the commencement of any work on the Premises.

29. CONSOLIDATION. This Part II and the accompanying Part I constitute one agreement and may be signed in any number of counterparts and shall be construed under the laws of the Commonwealth of Pennsylvania.

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Part II presents to be signed by their duly authorized officers or agents and their appropriate seals to be hereunto affixed, the day and year first above written.

By: Richard McGrath

Landlord
Title _____

"Tenant"

By _____

President / CEO
Title
E X H I B I T "C"

**LANDLORD SCOPE OF WORK**

The following work shall be completed, substantially completed or contracted for completion by Landlord, at Landlord's expense, prior to the Date of Occupancy as provided for herein.

○ Premises shall be broom clean and free of debris.

○ All mechanical systems including HVAC, electrical and plumbing systems, shall be in

good operating condition.

Landlord agrees to the following work:
1)  Raise interior lights to max height (13.5 ft ceiling height)
2)  Stripe exterior pavement to indicate the tenant portion of outdoor storage as delineated on Exhibit B.
3)  Remove trash dumpster currently located in area A on Exhibit B.

E X H I B I T "D"

TENANT SCOPE OF WORK

Tenant may at Tennant's cost:
1) Install additional bathroom capacity to suit
2) Install office space to suit
3) Install two (2) vertical penetrations in roof to support exhaust stacks.  Approximately 12' square
4) Install crane supports welded to building structure
5) Install equipment anchors in concrete floor to suit
6) Install demising wall on or about the location and extent indicated on Exhibit A.
7) Install exterior fencing to enclose Area B.
8) Pave Area B to the maximum allowed by applicable ordinance.
9) Build a 40X10X12  Lean To storage facility


Tenant may at Landlord's cost:
1) Provide one 25 ft wide dock high door.
2) Improve outdoor lighting (add lighting to outdoor storage space.)
3) Patch exterior pavement as required to provide a smooth surface in tenant portion of outdoor storage as delineated on Exhibit B.
Landlord shall reimburse Tenant for the cost of items 1-3 above in the form of a Tenant Improvement Credit which shall be equal to the total billed cost of items 1-3.  For the first 12 months beginning with the Base Rent Commencement Date, the Tenant shall reduce the monthly Rent paid to Landlord by an amount equal to the Tenant Improvement Credit divided by 12. Estimates of the cost of items 1-3 are attached as Exhibit F.

E X H I B I T "E"

ELECTRIC BASELINE YEAR

| Bill Date | Usage Period | Generation & Transmission - KH | Distribution - kW |
|---|---|---|---|
| 10/25/2012 | Sep 21- Oct 23 2013 | 21,600 KH | 106.0 kW |
| 11/26/2012 | Oct 23- Nov 21 2012 | 24,300 KH | 144.0 kW |
| 12/26/2012 | Nov 21- Dec 21 2012 | 35,400 KH | 160.0 kW |
| 1/24/2013 | Dec 21 2012- Jan 23 2013 | 47,400 KH | 176.0 kW |
| 2/25/2013 | Jan 23- Feb 22 2013 | 61,200 KH | 181.0 kW |
| 3/25/2013 | Feb 22 - March 22 2013 | 42,300 KH | 168.0 kW |
| 4/24/2013 | Mar 22 - April 23 2013 | 28,500 KH | 143.0 kW |
| 5/24/2013 | April 23- May 23 2013 | 15,900 KH | 143.0 kW |
| 6/26/2013 | May 23- Jun 24 2013 | 15,600 KH | 79.0 kW |
| 7/26/2013 | Jun 24- Jul 24 2013 | 22,200 KH | 98.0 kW |
| 8/26/2013 | Jul 24-Aug 22 2013 | 18,900 KH | 101.0 kW |
| 9/24/2013 | Aug 22 - Sep 23 2013 | 14,400 KH | 93.0 kW |

**EXHIBIT 3**

# First Lease Amendment

## To Lease Dated 11/26/2013

## Between Custom Fab (Tenant) and Richard A. McGrath (Landlord)

This First Lease Amendment is entered into this 16th day of December, 2013 by and between Richard A. McGrath currently having an address of 531 N Fourth St. P.O. Box 286 Denver, PA 17517 ("Landlord") and Custom Fab, having a place of business at 109 5th Street Orlando, Florida 32824("Tenant").

WHEREAS, Landlord and Tenant entered into a Lease Agreement for Premises at 531 N. Fourth St. Denver, PA 17517 dated November 26, 2013 (the "Original Lease");

NOW, THEREFORE, Landlord does hereby lease unto Tenant the "Additional Premises" at the "Additional Premises Rent" for the "Term" upon and under the Terms and Conditions set forth as follows:

**Additional Premises**

1. Warehouse:  12,860 SF +/- as shown on Exhibit A
2. Warehouse and office:  7,729 SF +/- as shown on Exhibit A
3. Outside storage spaces marked as "Area C" on Exhibit B.

**Tenants Proportionate Share** - The Tenants Proportionate Share shall be increased by the amount of the Additional Premises Tenant's Proportionate Share which shall be the sum of the i) weighted fraction of the building and the ii) weighted fraction of the exterior. The i) weighted fraction of the building shall be 70% multiplied by a fraction, the numerator of which shall be the 20,589 and the denominator of which shall be 74,000. The ii) weighted fraction of the exterior shall be 30% multiplied by a fraction the numerator of which shall be the 12,000 and the denominator of which shall be 119,308. The Additional Premises Tenant's Proportional Share is therefore determined to be 22.5%. Therefore the adjusted Tenants Proportionate Share is determined to be 52.5%

**Additional Premises Rent**

BASE TERM

| Time Period | Annual Amount | Monthly Amount |
|---|---|---|
| Year 1 | $ 78,466.47 | $ 6,538.87 |

Annual Base Rent increases for the Additional Premises shall be calculated as set forth in Paragraph 3.1 in the Original Lease.

**Lease and Rent Commencement Date** - The Term Begins date, Base Rent Commencement Date, Utility Commencement Date and Occupancy Date are all March 1, 2014 for the Additional Premises.



12,000SF - 14' ceiling

Custom Fab

21,330SF - 14' ceiling

w/ leveler 8'x10'
w/o leveler 8'x12'

.0'

Shared Dock Lane

Demising Wall

Shared Dock Lane

Additional Premises

.ling        12,860 SF        7,729 SF        22,005SF - 11' ceiling

135'

.4'        Office

Exhibit A



Exhibit B

**Expiration Date** - The Expiration Date of the Additional Premises shall be the same as the Expiration Date for the original Premises.

**Security Deposit** - The Security Deposit for the Additional Premises shall be $6,538.87, payable upon lease signing and shall be treated as in the Original Lease.

**Water/Sewer** - Change the amount specified in Paragraph 5.1.(a) of Part II of the Original Lease from $159.00 per month to $276.41 per month.

**Full Force and Effect** - Except as specifically modified by this First Lease Amendment, the Original Lease (the terms of which are incorporated by reference herein) shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have signed this Lease Extension and Modification Agreement the day and year first about written

Landlord: _____    Tenant: _____

By: ____Richard A. McGrath____    By: _Christopher M Comins_

Date: ___12/16/2013___    Date: _12-16-2013_

# EXHIBIT B

11193256v1



December 15, 2015

Richard A. McGrath
2245 Country Club Drive
Huntingdon Valley, PA 19006

Dear Richard A. McGrath:

The purpose of this notice is to inform you, pursuant to Section 26 of the Lease between Custom Fab, Inc. and yourself, that U.S. Pipe Fabrication (successor in interest to Custom Fab, Inc., referred to herein for simplicity's sake as Custom Fab) will capitulate to your demands that it vacate the leased premises located at 531 N. 4th Street, Denver, Pennsylvania (the Leased Premises). Custom Fab will vacate the Leased Premises on or about March 1, 2016. Since the Court's Opinion and Order in Custom Fab, Inc. v. Richard A. McGrath you have made it clear, through your words and actions, that you no longer desire Custom Fab to occupy the Leased Premises at 531 N. Fourth Street, Denver, Pennsylvania.

On February 4, 2014, Judge Madenspacher issued an Opinion and Order in Custom Fab, Inc. v. Richard A. McGrath. It was Custom Fab's hope and desire that the Opinion and Order, which addressed all outstanding disputes between the parties at the time, would result in Custom Fab being able to quietly enjoy the Leased Premises. Unfortunately, interference with Custom Fab's quiet enjoyment only increased. You continuously demanded that Custom Fab remove concrete barriers and remove signs or you would exercise self-help remedies and remove them yourself. You continuously demanded that Custom Fab reduce its use of the Property to 42% of the total footprint, despite the Lease depicting very clearly the composition of the Leased Premises. You continuously demanded that Custom Fab remit huge sums for "rental violations" in 2014. You continuously demanded that Custom Fab remove its outdoor storage or you would exercise self-help. You called the police and demanded that trespass charges be filed simply because Custom Fab was using a portion of Area C. You made all of these demands despite the fact that you requested relief on these items from the Judge and he did not award you the relief requested. Although you did not appeal the Judge's Opinion and Order, you exhibit your rancorous dissatisfaction with his decision by assailing Custom Fab with demands for relief you were not granted. Custom Fab will no longer subject itself to this continued vitriol.

Corporate Headquarters • 109 Fifth Street • Orlando, Florida 32824
P 407.859.3954 • 800.440.3157 • F 800.599.5805 • Member AWWA and

A Division of U.S. Pipe & Foundry 

Not only have you undertaken the above actions, you have on numerous occasion threatened to evict Custom Fab. You demanded that the electric provider, PP&L, terminate service to Custom Fab, Inc. You lament that PP&L does not disconnect the power despite the fact that you have ceased paying the electric bill and Custom Fab, Inc. has had to pay the past due balances for its electric use and your electric use. You have not even provided Custom Fab with a copy of the November and December electric bill to allow the tenant to pay the bills. You demand that Custom Fab take certain actions and you don't even provide the documents that are necessary for Custom Fab to fulfill its obligations.

On top of all the other actions, you have informed Custom Fab on numerous occasions that the Lease is invalid.

Unfortunately, the cumulative effect of your efforts to deprive Custom Fab the use of the Leased Premises has led us to seek an alternate location. You have made it clear that you do not desire Custom Fab to occupy the Leased Premises, and if Custom Fab attempted to remain it would require a never ending barrage of litigation, resulting in an unreasonable burden on Custom Fab. Although you are aware of the actions you have taken, I have included some documents for your ease of reference, and I incorporate them into this Notice. I have included the Amended Motion for Contempt and Sanctions, which details in part your continued unreasonable interference with Custom Fab's use of the Leased Premises. I have also included a small sampling of various emails that you have sent that contain your continued, unsupported, and unreasonable demands to Custom Fab.

In summary, you have consistently demanded that Custom Fab not utilize substantial portions of the Leased Premises. You have demanded that the electric company terminate Custom Fab, Inc's electric service, despite Custom Fab's willingness to pay all electric expenses directly to PP&L. You have threatened to remove Custom Fab, Inc.'s property. You have declared that the Lease is invalid and that you do not approve of it. This pervasive substantial interference with Custom Fab, Inc.'s quiet enjoyment of the Leased Premises has substantially interfered with the utility of the Leased Premises. Despite Custom Fab's attempts to discuss an amicable separation of ways to avoid continued disputes, costs, and potential litigation, your responses have been far from reasonable. Therefore, Custom Fab will vacate the Leased Premises on or about March 1, 2016.

Custom Fab, Inc. will continue to remit to you, or in this case, your assignee, Metro Bank, the appropriate rent through the date of Custom Fab's vacation of the



Leased Premises. Custom Fab will also continue to remit payment to all utilities serving the Leased Premises. However, Custom Fab is not in any way waiving, releasing, or limiting its right to seek damages from you occasioned by your substantial interference with the quiet enjoyment of the Leased Premises and any legal costs expended by Custom Fab related thereto.

Sincerely,

Chris Comins,
President, U.S. Pipe

Fabrication

Enclosures

cc:    Norb Gross, VP Supply Chain & Logistics, U.S. Pipe
       Sam Wiser, Salzmann Hughes, P.C.

Corporate Headquarters • 109 Fifth Street • Orlando, Florida 32824
P 407.859.3954 • 800.440.3157 • F 800.599.5805 • Member AWWA and

A Division of U.S. Pipe & Foundry

# EXHIBIT C

11193256v1



**SALZMANN HUGHES, P.C.**
*Attorneys at Law*
EXPERIENCE · INTEGRITY · INNOVATION

*Please reply to:*

**112 Market Street, 8th Floor**
**Harrisburg, PA 17101**
**Phone:  717.234.6700**

Chambersburg • Carlisle • Harrisburg • Gettysburg

April 20, 2016

Samuel W. Cortes, Esquire
Ashley L. Beach, Esquire
FOX ROTHSCHILD, LLP
747 Constitution Drive, Suite 100
P.O. Box 673
Exton, PA 19341-0673

    Re:    *McGrath v. U.S. Pipe Fabrication, LLC*
           Eastern District Court of Pennsylvania
           Docket No. 2:16-cv-00960-WD

Counsel:

    I write with respect to the identity of the Defendants in the above-captioned matter.  The real party in interest and the lessee is Custom Fab Inc., and not U.S. Pipe Fabrication, LLC ("U.S. Pipe").  U.S. Pipe owns the stock of Custom Fab, Inc.  U.S. Pipe is not the successor of Custom Fab, Inc. with respect to the lease or otherwise; Custom Fab, Inc. is the lessee and should be the proper Defendant in this matter.

    Attached are documents demonstrating that U.S. Pipe acquired the stock of Custom Fab, Inc.  Should you require any further documentation regarding the relationship between U.S. Pipe and Custom Fab, Inc. please contact me.  I hope that this information resolves any confusion that may have existed with respect to the legal status of Custom Fab, Inc. with regard to this matter.

    We believe that you should take steps to correct the identity of the Defendant in this matter.  You have our concurrence in any effort on your behalf to make this correction.  Given the enclosed information, we think it would be incorrect and unsupportable to maintain this action against U.S. Pipe under these circumstances.

    We look forward to your taking steps immediately to correct the caption and direct this action against Custom Fab, Inc. only.  If for any reason you are unwilling to take the requested steps, we would appreciate the courtesy of knowing that quickly, so we may necessary action to correct the identity of the Defendant.

Samuel W. Cortes, Esquire
Ashley L. Beach, Esquire
FOX ROTHSCHILD, LLP
April 20, 2016
Page 2

      If you have any questions or concerns, please feel free to contact me at the address listed above.  Please note our new Harrisburg office address.

                    Very Truly Yours,

                    *SALZMANN HUGHES, P.C.*

                    Scott T. Wyland

STW/lgk
Enclosure

cc:    Sam Wiser, Esquire



INCORPORATED UNDER THE LAWS
OF THE STATE OF FLORIDA

NUMBER
2

SHARES
1,000

## CUSTOM FAB, INC.

This Certifies that _____ US Pipe Fabrication, LLC _____

registered holder of One Thousand (1,000) _____ is the _____ Shares

of Voting Common Stock, with $0.01 par value, of Custom Fab, Inc.

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed

this ____ 13th ____ day ____ of ____ August ____ A.D. 2015

Brad Overstreet, Secretary

Paul Ciolino, Chief Executive Officer



PASTE CANCELLED CERTIFICATE IN THIS SPACE

CERTIFICATE No. ___A-3___ FOR ___100 Voting___ SHARES (or units, membership interests, partnership interests, etc., as appropriate)

ISSUED TO

U.S. Pipe Fabrication, LLC

CANCELLED

DATED ___August 7, 2015___

Transfer From Original Issue

FROM WHOM TRANSFERRED: **Christopher M. Comins Revocable Trust dtd July 3, 2003, as amended and restated**

DATED ___August 7, 2015___

| ORIGINAL CERTIFICATE NUMBER | ORIGINAL NUMBER | NUMBER TRANSFERRED |
|---|---|---|
| A-2 | 100 | 100 |

**CANCELLATION OF STAMPS:** In ink, mark stamps with initials, day, month and year; make 3 parallel incisions lengthwise thru stamp at time of affixing. Stamp shall not be so defaced as to prevent ready determination of its denomination and genuineness.

RECEIVED CERTIFICATE No. _____ FOR _____ SHARES (or units, membership interests, partnership interests, etc., as appropriate)

THIS _____ DAY OF _____

Transfer Details For Surrendered Certificate

NEW CERTIFICATES ISSUED TO:

| | NUMBER TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|
| | | |
| | | |
| | | |



PASTE CANCELLED CERTIFICATE IN THIS SPACE

CANCELLATION OF STAMPS:
In ink, mark stamps with initials, day, month and year; make 3 partial incisions lengthwise thru stamp at time of affixing. Stamp shall not be so defaced as to prevent ready determination of its denomination and genuineness.

RECEIVED CERTIFICATE No. _____ FOR _____ SHARES (or units, membership interests, partnership interests, etc., as appropriate)

THIS _____ DAY OF _____

CERTIFICATE No. __B-9__ FOR __900 Non-Voting__ SHARES (or units, membership interests, partnership interests, etc., as appropriate)

ISSUED TO

U.S. Pipe Fabrication, LLC

CANCELLED

DATED __August 7, 2015__

Transfer From Original Issue

FROM WHOM TRANSFERRED:   Cindy Pullman, Holly Porter,
Thomas Klingensmith, Kyle Comins, Christopher M. Comins Rev Trust

DATED __August 7, 2015__

| ORIGINAL CERTIFICATE NUMBER | ORIGINAL NUMBER | NUMBER TRANSFERRED |
|---|---|---|
| B-2 10 NV; B-3 20 NV; B-4 20NV | | |
| B-6 50 NV; B-8 800 NV | | |

Transfer Details for Surrendered Certificate

NEW CERTIFICATES ISSUED TO:

| NUMBER TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|
| | |

# EXHIBIT D

11193256v1



Fox Rothschild LLP
ATTORNEYS AT LAW

Eagleview Corporate Center
747 Constitution Drive, Suite 100
P.O. Box 673
Exton, PA 19341-0673
Tel 610.458.7500  Fax 610.458.7337
www.foxrothschild.com

ASHLEY L. BEACH
Direct Dial: 610-458-2997
Email Address: ABeach@FoxRothschild.com

January 14, 2016

**VIA E-MAIL**

Samuel E. Wiser, Jr., Esquire
Salzman Hughes, PC
79 St. Paul Drive
Chambersburg, PA  17201

Re:    **Richard A. McGrath and U.S. Pipe Fabrication**

Dear Mr. Wiser:

As you know, this office represents Richard A. McGrath ("Mr. McGrath") with respect to the Lease by and between Mr. McGrath and U.S. Pipe Fabrication (as successor-in-interest to Custom Fab, Inc. and referred to herein as "Custom Fab") for the property located at 531 N. Fourth Street, Denver, Pennsylvania (the "Lease" and the "Leased Premises," respectively).  By letter dated December 15, 2015 ("December Letter"), Custom Fab informed Mr. McGrath (1) that it was anticipatorily breaching the Lease by stating its intention to vacate the Leased Premises on March 1, 2016, and (2) that it would continue to pay Mr. McGrath's assignee, Metro Bank, the "appropriate rent through the date of Custom Fab's vacation of the Leased Premises," only.  As such, Custom Fab is in breach and Mr. McGrath is entitled to accelerate the full balance due under the lease – through November 20, 2018.

Additionally, Custom Fab has failed to pay the full rent owed to Mr. McGrath from December 2014 to the present.  Custom Fab's rental payments, when made, failed to reflect the 1.7% Consumer Price Index adjustment provided for in the Lease.  Lease, ¶ 3.1.  The past due rent, fees, and late charges owed by Custom Fab for the Leased Premises total $146,040.38.  Custom Fab's failure to make timely payments is an event of default under the Lease further entitling Mr. McGrath to declare the rent for the balance of the Lease immediately due and payable.  Lease, ¶¶ 17, 18.1.

A Pennsylvania Limited Liability Partnership

| California | Colorado | Connecticut | Delaware | District of Columbia | Florida |
| Illinois | Minnesota | Nevada | New Jersey | New York | Pennsylvania | Texas |

38423984



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Samuel E. Wiser, Jr., Esquire
January 14, 2016
Page 2

Finally, as a result of damage to Mr. McGrath's driveway caused by Custom Fab's overweight truck, Mr. McGrath has been damaged in the amount of approximately $50,000.00.

Based on the foregoing breaches, Mr. McGrath demands that Custom Fab remit the total sum owed to him under the Lease of $772,422.83, no later than Friday, January 22, 2016. Absent prompt payment, Mr. McGrath reserves the right to take any and all actions necessary to protect his interests.

Thank you.

Very truly yours,

Ashley L. Beach

Ashley L. Beach

ALB:jcc

38423984

# EXHIBIT E



February 11, 2016

Richard A. McGrath
2245 Country Club Drive
Huntingdon Valley, PA 19006

Dear Richard A. McGrath:

You were previously notified by letter dated December 15, 2015 that U.S. Pipe Fabrication (successor in interest to Custom Fab, Inc., referred to herein for simplicity's sake as Custom Fab) would be vacating the leased premises located at 531 N. 4th Street, Denver, Pennsylvania (the "Leased Premises") on or about March 1, 2016. The December 15, 2015 letter is incorporated herein by reference.

The purpose of this notice is to inform you that Custom Fab's vacation of the Leased Premises will extend to April 1, 2016 due to unforeseen circumstances involved with such a complex and unanticipated move. Custom Fab's reason for vacating the Leased Premises remains the same as cited in the December 15, 2015 letter along with your subsequent conduct that continues to substantially interfere with Custom Fab's use of the Leased Premises.

Custom Fab, Inc. will continue to remit to you, or in this case, your assignee, Metro Bank, the appropriate rent through the date of Custom Fab's vacation of the Leased Premises. Custom Fab will also continue to remit payment to all utilities serving the Leased Premises. However, Custom Fab is not in any way waiving, releasing, or limiting its right to seek damages from you occasioned by your substantial interference with the quiet enjoyment of the Leased Premises and any legal costs expended by Custom Fab related thereto.

Sincerely,

Christopher Comins,
President, U.S. Pipe Fabrication

cc:    Norb Gross, VP Supply Chain & Logistics, U.S. Pipe
       Sam Wiser, Salzmann Hughes, P.C.

Corporate Headquarters • 109 Fifth Street • Orlando, Florida 32824
P 407.859.3954 • 800.440.3157 • F 800.599.5805 • Member AWWA and

A Division of U.S. Pipe & Foundry 

# EXHIBIT F

11193256v1









